**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO (DENVER)**

| | |
|---|---|
| In re. WESTON EDUCATIONAL, INC.,<br><br>Debtor | Chapter 7<br>Bankr. Case No. 16-21382-JGR |
| DIANNE WAUNSCH, AMY D'ANDREA, TANJA JOHNSON and CLAY ADAIR on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>WESTON EDUCATIONAL, INC., d/b/a Heritage Institute, d/b/a Heritage College, d/b/a Missouri College and EARL WESTON, individually and in his representative capacity,<br><br>Defendants. | **CLASS ACTION ADVERSARY PROCEEDING COMPLAINT**<br><br>**Case No.:** |

**CLASS ACTION ADVERSARY PROCEEDING COMPLAINT FOR VIOLATION OF WARN ACT 29 U.S.C. § 2101, *ET SEQ*. AND STATE WAGE PAYMENT LAWS**

Plaintiffs Dianne Waunsch, Amy D'Andrea, Tanja Johnson and Clay Adair ("Plaintiffs")[1], on behalf of themselves and a class of similarly situated employees, hereby allege the following against Debtor Weston Educational, Inc. ("Heritage" or "Debtor") and Earl Weston (together, "Defendants"):

**NATURE OF THE ACTION**

1. Plaintiffs were employees of Heritage and were terminated on November 1, 2016 as part of mass layoffs and/or plant closings.

2. On or about November 1, 2016, Heritage terminated approximately 600 other

[1] As of the date of the filing of this adversary proceeding complaint, the undersigned counsel has been retained by more than 100 former employees of Defendants.

similarly situated employees as part of the same set of terminations.

3. On November 1, 2016, Heritage announced that it was permanently discontinuing its operations.

4. On November 8, 2016, Plaintiffs filed a Class Action Complaint against Defendants in the U.S. District Court, District of Colorado, alleging that they were terminated on or about November 1, 2016 without notice required by the WARN Act and state laws. The action is entitled *Waunsch et al v. Weston Educational, Inc. et* al, Case No. 1:16-cv-02739.

5. On November 21, 2016, Debtor filed for Chapter 7 bankruptcy in this Court.

6. Plaintiffs bring this action on behalf of themselves, and the other similarly situated former employees of Heritage who were terminated without cause, as part of, or as the foreseeable result of the mass layoffs or plant closings ordered by Heritage on or about November 1, 2016 and within thirty (30) days of that date.

7. Plaintiffs and all similarly situated employees seek to recover 60 days wages and benefits from Heritage because they were not provided 60 days advance written notice of their terminations, as required by the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq*.

8. Plaintiffs and all similarly situated employees were not paid the wages they earned during their final three weeks of employment.

9. Along with their unpaid wages, Plaintiffs and all similarly situated employees also seek to recover pay equivalent to the vacation hours they accrued under Heritage's policies and the wage and benefits laws or the common law of the states in which they were employed, along with any applicable penalties and/or liquidated damages.

10. Plaintiffs' claims, as well as the claims of all similarly situated employees, are entitled to wage priority status, under 11 U.S.C. § 507(a)(4) and (5) or in the alternative, administrative priority status pursuant to the United States Bankruptcy Code § 503(b)(1)(A).

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1331, 1334 and 1367 and 29 U.S.C. § 2104(a)(5).

12. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

13. Venue in this Court is proper pursuant to 28 U.S.C. § 1409 and 29 U.S.C. § 2104(a)(5).

14. Violations of the WARN Act alleged herein occurred in Denver, Colorado and venue is proper in this District pursuant to 29 U.S.C. § 2104(a)(5).

## THE PARTIES

### ***Plaintiffs***

15. At all relevant times, Plaintiff Dianne Waunsch was employed by Weston Educational, Inc. and worked as a Lead Instructor for more than three years at its facility located at 6630 Orion Drive, Suite 200, Fort Myers, Florida (the "Fort Myers Facility").

16. At all relevant times, Plaintiff Amy D'Andrea was employed by Weston Educational, Inc. and worked for more than two years as an Education Specialist overseeing the Veterinary Technology program and other matters across the campuses at its headquarters facility located at 4704 Harlan Street, Suite 500, Denver, Colorado, (the "Denver Facility").

17. At all relevant times, Plaintiff Clay Adair was employed by Weston Educational, Inc. and worked for over two years as Program Director of its facility located at 2800 South Rock Rd, Wichita, Kansas (the "Wichita Facility").

18. At all relevant times, Plaintiff Tanja Johnson was employed by Weston Educational, Inc. and worked as an Admissions Representative at its facility located at 7202 S I 35 Service Road Oklahoma City, Oklahoma (the "Oklahoma City Facility").

***Defendants***

19. Defendant Weston Educational, Inc., (or"Heritage"), is a Colorado corporation with its principal place of business located at 4704 Harlan Street, Suite 500, Denver, Colorado, and conducted business in this district.

20. In addition to the Fort Myers, Denver, Wichita, and Oklahoma City Facilities, Heritage maintained other facilities, as that term is defined in the WARN Act, including campuses in Cleveland and Columbus, Ohio; Jacksonville, Florida; Little Rock, Arkansas; Kansas City and St. Louis (including campuses for Heritage and Missouri College), Missouri; and Lake Forest, California. Together, these facilities are collectively referred to herein as the "Facilities."

21. Upon information and belief, at all relevant times, the Plaintiffs and other similarly situated former employees worked at, reported to, or received instructions from the Denver Facility or one of the other Facilities.

22. Upon information and belief, Defendant Earl Weston owns Heritage, was its Chairman and final Chief Executive Officer, and ordered the shutdown of all the Facilities and termination of the Plaintiffs and similarly situated Heritage employees.

23. On information and belief, Mr. Weston has privately held Heritage since 1986, as well as related entities, including at-Homes Professions, Inc., and Weston Enterprises, Inc., which is a car dealership. These entities are combined in what is referred to as "Weston Education Group."

24. Weston Education Group provides management and support for the Weston entities. On information and belief, Lynn Steinbach is payroll manager for Heritage and the other entities.

25. On information and belief, Mr. Weston controlled the decision as to whether and how much to pay Heritage's employees, especially with respect to the payments distributed at the time of their termination.

26. On information and belief, Mr. Weston made the decision to continue operations despite financial adversity during Heritage's final weeks of operation.

27. Heritage was a for-profit post-secondary school institution focused on allied health careers, whose largest program trained students for veterinary technology positions.

28. In, or around, 2013, Heritage had enrollment of approximately 5,000 students.

29. In 2011, two student relators filed a qui tam complaint under the False Claims Act alleging that Heritage engaged in fraudulent practices resulting in the improper payment and retention of federal financial aid. *U.S. ex rel. Miller v. Weston Educ., Inc.*, 10 F. Supp. 3d 1046 (W.D. Mo. 2014), *aff'd in part, rev'd in part and remanded.* 784 F.3d 1198 (8th Cir. 2015), *cert. granted, judgment vacated*, 136 S. Ct. 2505 (2016), and *aff'd in part, rev'd in part and remanded sub nom. United States ex rel. Miller v. Weston Educ., Inc.*, No. 14-1760, 2016 WL 6091099 (8th Cir. Oct. 19, 2016). In the current remand of this case before the U.S. Court of Appeals for the Eighth Circuit, the United States of America has filed an amicus brief in support of the plaintiffs/relators.

30. In November 2014, Eric Chiusolo was hired to replace Heritage's former long-term chief executive officer.

31. On information and belief, upon becoming the CEO, Mr. Chiusolo began terminating most of Heritage's National Directors and replaced them with Vice Presidents who were beholden to him, were paid high salaries, and were sequestered on a floor of the Denver headquarters accessible only by pass key. Many of these senior managers lived in other parts of the country and visited headquarters infrequently.

32. Mr. Chiusolo also began ordering large staff layoffs.

33. In July of 2015, Mr. Chiusolo ordered significant changes to the curricula of Heritage, slashing the number of credits and amount of content being taught in the program. The reductions drew complaints and criticism from stakeholders and posed risks to reaccreditation.

34. In the summer of 2015, Heritage acquired Missouri College, which maintained certain control over its own program and administrative operations, but ultimately was controlled and shut down by Heritage.

35. In the spring of 2016, Heritage managers responsible for purchasing materials and services for operations encountered difficulty obtaining approval for requisition requests, ostensibly because Heritage was not willing or able to make timely payments to vendors

36. Upon information and belief, by 2016 Heritage enrollment had dropped to approximately 1,800 students, and hiring slowed significantly in that year.

37. Upon information and belief, Heritage fell eight months behind on rent payments for its Wichita Facility, which caused the landlord to put it on the market for sale.

38. Upon information and belief, the Little Rock campus had its utilities turned off twice, once in June and once in September 2016, due to nonpayment.

39. Upon information and belief, Heritage did not pay rent on the Columbus campus since January of 2016 and was served an eviction notice from the landlord with a demand to vacate by October 31, 2016.

40. In the late summer of 2016, Heritage's upper management sought to stem growing concern at headquarters over Heritage's financial predicament by making rosy statements to the staff about Heritage's condition.

41. On Friday, October 28, 2016, Earl Weston appeared at a meeting of the employees at the Denver Facility, and addressed them as Heritage's chief executive.

42. On information or belief, earlier that week, CEO Eric Chiusolo left the company and was escorted out of the building.

43. Mr. Weston told the gathered employees on October 28 that Heritage was unable to pay their salaries due to a lack of funds. Weston said that employees would receive less than their full paychecks for the pay period of October 8-22, 2016.

44. Mr. Weston stated at the October 28th meeting that, although he was "not a rich man," he personally paid a million dollars to cover payroll because Heritage lacked funds.

45. Neither Mr. Weston, nor anyone else, suggested to the employees at headquarters meeting that Heritage was downsizing or closing, or that their jobs were in jeopardy.

46. November 1, 2016 began as a normal work day. In the early afternoon, Heritage ordered headquarters employees to leave the Denver Facility. Employees were asked to provide private email addresses so that they could be contacted thereafter. They were told Heritage was permanently closing its doors at that time, and that their work email accounts were also shut down.

47. Upon information and belief, Heritage managers made similar announcements to the employees at all of the campuses around that time, and employees departed accordingly.

48. Upon exiting the Denver Facility on November 1, 2016, employees were handed checks in the amount of $700 per employee.

49. The checks were drawn on various Weston Educational Inc. accounts in cities where it has campuses, including Weston Educational Inc. Heritage Institute – Jacksonville, Florida.

50. The stub accompanying the $700 paper checks indicated the amount was "regular earnings" for the period ending October 21, 2016, and that no deductions were being taken for federal income tax or federal or state employment taxes.

51. On November 1, 2016, Lynn Steinbach, the payroll manager of Weston Education Group, told the gathered employees at the Denver facility that if funds were available, they would be paid an additional sum of $700 on November 7, 2016 by direct deposit or paper check.

52. On or after November 3, 2016, employees received a letter dated November 1, 2016 signed by Earl Weston as CEO of Weston Educational Inc. It explained that the employee was terminated as of that date and that he or she would not be paid their full wages.

53. Mr. Weston wrote in the November 1, 2016 that: "We are very sorry to report that your paycheck for this pay period is for less than your regular paycheck amount. Weston Educational simply does not have the necessary monies available in its accounts to fund a full payroll payment to you for this payroll period." It also stated that "Due to a lack of funds, your paycheck for the pay period 10/22-11/01/2016 will regrettably be for less than the full amount of your accrued wages." Attached to the November 1 letter was a statement entitled "Closure Information for Employees - November 3, 2016".

54. The Closure Information for Employees statement told employees their health insurance and benefit plans were terminated immediately, that no COBRA continuation was available to them, and, *inter alia*, advised them to seek their own health insurance under the Affordable Care Act.

55. On November 8, 2016, Weston Educational Inc. made direct deposits in employees' ADP accounts in the amount of $650 per employee. The ADP statement indicated it was pay for the period October 22-November 4, 2016. From the lump sums, federal income withholding and employment taxes were deducted. The ADP statement included the words: YOUR COMPANY PHONE NUMBER IS:- 970-207-4551, which number answered as the human resources department of another Weston (distance learning) entity.

**CLASS ALLEGATIONS**

56. Plaintiffs bring a Claim for Relief for violation of 29 U.S.C. § 2101 *et seq*., on behalf of themselves and on behalf of all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ. P. 23(a), who worked at or reported to one of Heritage's Facilities and were terminated without cause on or about November 1, 2016, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings by Heritage on or about November 1, 2016, and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "Class").

57. Plaintiffs also bring Claims for Relief for violation of state wage laws for which they seek class certification. These claims are brought on behalf of themselves and on behalf of all other similarly situated former employees terminated on or about November 1, 2016 who were not paid the wages and benefits to which they were entitled under the laws of the state in which they worked.

58. The persons in the Class identified above (the "Class Members") number approximately 600 and are therefore so numerous that joinder of all members is impracticable.

59. At the time of the filing of this Class Action Adversary Proceeding Complaint, the undersigned counsel had been retained by more than 40 individuals similarly situated to the Plaintiffs, for the purpose of bringing this class action suit against Heritage.

60. On information and belief, the identity of the members of the Class and the recent residence address of each Class Member is contained in the books and records of Heritage.

61. The rate of pay and benefits that were being paid by Heritage to each Class Member at the time of his/her termination is contained in the books and records of Heritage.

62. Common questions of law and fact exist as to the Class Members, including, but not limited to, the following:

(a) whether Class Members were employees of Heritage who worked at or reported to Heritage's Facilities;

(b) whether Heritage unlawfully terminated the employment of the Class Members without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act;

(c) whether Heritage unlawfully failed to pay the Class Members 60 days wages and benefits as required by the WARN Act; and

(d) whether Heritage unlawfully failed to pay the Class Members their unpaid wages and benefits as required by state law.

63. Plaintiffs' claims are typical of those of the Class. Plaintiffs, like other WARN Class Members, worked at or reported to one of Heritage's Facilities and were terminated without cause by Heritage on or about November 1, 2016, in mass layoffs and/or plant closings,

as defined by 29 U.S.C. § 2101(a)(2), (3) or as the reasonably foreseeable result of the mass layoffs or plant closings on November 1, 2016.

64. Plaintiffs' claims are typical of those of the Class, in that all the Class Members were deprived of their final wages and benefits in the same manner.

65. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

66. Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant, and damages suffered by individual Class members are small compared to the expense and burden of individual prosecution of this litigation.

67. Concentrating all the potential litigation concerning the Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

68. The Plaintiffs intend to send notice to all Class Members to the extent required by Fed. R. Civ. P. 23.

69. The relief sought in this proceeding is predominately equitable in nature.

70. Plaintiffs seek a jury trial on all claims that may be tried by a jury.

## CLAIMS FOR RELIEF

### First Cause of Action: Violation of the WARN Act, 29 U.S.C. § 2104
### (Against Defendant Weston Educational, Inc.)

71. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

72. At all relevant times, Heritage employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

73. At all relevant times, Heritage was an "employer," as that term is defined in 29 U.S.C. § 2101(a)(1) and 20 C.F.R. § 639(a), and continued to operate as a business enterprise until they decided to effect mass layoffs or plant closings at the Facilities.

74. On information and belief, on or about November 1, 2016, Heritage effected mass layoffs and/or plant closings at the Facilities, as those terms are defined by 29 U.S.C. § 2101(a)(2).

75. The mass layoffs or plant closings at the Facilities resulted in "employment losses," as that term is defined by 29 U.S.C. § 2101(a)(2) for at least fifty of Heritage's employees as well as more than thirty-three percent (33%) of Heritage's workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2101(a)(8).

76. Plaintiffs and the Class Members were terminated by Heritage without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Heritage at the Facilities.

77. Plaintiffs and the WARN Class Members are "affected employees" of Heritage within the meaning of 29 U.S.C. § 2101(a)(5).

78. Heritage was required by the WARN Act to give the Plaintiffs and the WARN Class Members at least 60 days advance written notice of their terminations.

79. Heritage failed to give the Plaintiffs and the WARN Class members written notice that complied with the requirements of the WARN Act.

80. Plaintiffs and each of the Class Members are "aggrieved employees" of Heritage as that term is defined in 29 U.S.C. § 2104(a)(7).

81. Heritage failed to pay Plaintiffs and each of the WARN Class Members their respective wages, salary, commissions, bonuses, accrued holiday pay and accrued vacation for 60 days following their respective terminations, and failed to make the pension and 401(k) contributions and provide employee benefits under COBRA for 60 days from and after the dates of their respective terminations.

82. Inasmuch as the Plaintiffs and each of the Class Members seek back-pay attributable to a period of time after the filing of the Defendants' bankruptcy petition and which arose as the result of the Defendants' violation of federal law, Plaintiffs' and the Class Members' claims against Defendants are entitled to first priority administrative expense status pursuant to 11 U.S.C. § 503(b)(l)(A), or alternatively, priority treatment pursuant to 11 U.S.C. § 507(a)(4) or (5), and the remainder as a general unsecured claim

**Second Cause of Action: Unpaid Wages - Arkansas**
**(against all Defendants)**

83. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

84. Arkansas Code § 11-4-405 provides that employees unpaid wages shall become due and payable on their day of discharge.

85. Defendants failed to pay their Arkansas employees all wages owed on their day of discharge and are liable to them for those amounts.

86. Additionally, § 11-4-405 provides that any employee may request to have the money to him or her sent to a location where a regular agent is kept and if the money does not arrive within seven days, a penalty of continuing accrual of wages of up to sixty days shall be incurred by the employer.

**Third Cause of Action: Unpaid Wages - California**
**(against all Defendants)**

87. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

88. California Labor Code § 201 provides that any discharged employee is entitled to all wages due at the time of discharge.

89. Where an employer willfully fails to pay discharged employees all wages due as required under the California Labor Code, the employer is liable to such employees under California Labor Code § 203 for waiting time penalties in the amount of one day's compensation at the employees' regular rate of pay for each day the wages are withheld, up to thirty days.

90. Defendants knowingly and willfully violated California Labor Code § 201 by failing to pay its California employees all wages owed as alleged herein. Defendants are therefore liable to those employees for their unpaid wages as well as waiting time penalties as required by California Labor Code § 203.

91. California Labor Code § 227.3 provides that an employer must compensate discharged employees for accrued, unused vacation time at the employee's final rate of pay.

92. Defendants knowingly and willfully violated California Labor Code § 227.3 by failing to pay its terminated California employees for accrued, unused vacation days and are liable to their California employees for those days at their final rate of pay.

**Fourth Cause of Action: Unpaid Wages - Colorado**
**(against all Defendants)**

93. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

94. Colorado Revised Statutes § 8-4-109 provides that an employer must compensate discharged employees for any unpaid wages or compensation at the time of discharge.

95. Defendants failed to pay their Colorado employees all wages owed on their day of discharge and are liable to them for those amounts.

96. Additionally, Colorado Revised Statutes § 8-4-109 provides that any employee may send a written demand for payment and if the wages or compensation are not paid within fourteen days, a penalty of the greater of the following: (1) the employee's average daily earnings for each day, not to exceed ten days, until such payment or other settlement satisfactory to the employee is made, or (2) one hundred twenty-five percent of that amount of the owed wages or compensation up to and including seven thousand five hundred dollars; and fifty percent of the amount of the wages or compensation that exceed seven thousand five hundred dollars.

97. Willful failure to pay such wages results in an increase in the above penalty by fifty percent.

98. Defendants' Colorado employees intend to send a letter requesting such payment.

**Fifth Cause of Action: Unpaid Wages - Florida**
**(against all Defendants)**

99. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

100. During the relevant time period Defendants' Florida employees performed services for Defendants by continuing to perform work, Defendants acquiesced in the provision of those services, were aware that their employees expected to be compensated for the value of those services, failed to compensate their employees fully, and were unjustly enriched thereby.

101. Defendants' Florida employees also provided, and the Defendants assented to and received, a benefit in the form of services rendered by the employees.

102. In the ordinary course of common events, a reasonable person normally would expect to pay its employees.

103. Accordingly, Defendants' Florida employees are entitled to payment as a result of Defendants' unjust enrichment or in quantum meruit for the work they performed for Defendants but were not compensated for upon or around their termination.

**Sixth Cause of Action: Unpaid Wages - Kansas**
**(against all Defendants)**

104. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

105. Kansas Statutes § 44-315 provides that when an employer discharges or lays off an employee, the employer must pay the employee all wages due by the next regular payday on which he or she would have been paid if still employed.

106. An employer who willfully fails to pay all wages due shall also be liable to the employee for a penalty in the fixed amount of 1% of the unpaid wages for each day, except

Sunday and legal holidays, upon which such failure continues after the eighth day after the day upon which payment is required or in an amount equal to 100% of the unpaid wages, whichever is less.

107. Defendants willfully failed to pay their Kansas employees all wages due by the next payday after their termination and therefore is liable to them for a penalty in the amount of 100% of the unpaid wages or 1% of all wages for each non weekend or holiday day after the eighth day of termination, whichever is less.

**Seventh Cause of Action: Unpaid Wages – Missouri**
**(against all Defendants)**

108. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

109. Missouri Statutes § 290.110 provides that employees must be paid all wages then earned on the day of discharge.

110. Defendants failed to pay their Missouri employees all wages owed on their day of discharge and are liable to them for those amounts.

111. Additionally, § 290.110 provides that any employee may request to have the money to him or her sent to a location where a regular agent is kept and if the money does not arrive within seven days, a penalty of continuing accrual of wages of up to sixty days shall be incurred by the employer.

112. Defendants' Missouri employees intend to send a letter requesting such payment.

**Eighth Cause of Action: Unpaid Wages - Oklahoma**
**(against all Defendants)**

113. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

114. Oklahoma Statue, Title 40, § 5-165.3 provides that an employer must pay a terminated employee's wages in full by the next regular designate payday.

115. Pursuant to that provision, an employer who fails to pay those wages as required is liable for liquidated damages in the amount of 2% for each day after which the wages were earned and due if the employer willfully withheld wages over which there was no bona fide disagreement, on in an amount equal to the unpaid wages.

116. Defendants willfully failed to pay their Oklahoma employees all wages due to them upon termination by their next regular payday.

117. There was no bona fide disagreement as to whether these wages were owed to Defendants' Oklahoma employees.

118. Defendants are liable to their Oklahoma employees for their unpaid wages and liquidated damages of 2% for each day after which the wages were earned and due or an amount equaling the total unpaid wages.

**Ninth Cause of Action: Unpaid Wages - Ohio**
**(against all Defendants)**

119. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

120. Ohio Revised Code § 4113.15 provides that employees must be paid by the first of each month for the wages earned during the first half of the preceding month and for payment by the fifteenth day of each month for the wages earned during the second half of the preceding month.

121. Defendants failed to pay and have indicated that they will not pay their Ohio employees the wages owed to them upon the first of the month of November 2016 and the fifteenth of the month.

122. Defendants are therefore liable to their Ohio employees for these unpaid wages as well as liquidated damages in the amount of six percent of the amount of the claim or two hundred dollars, whichever is greater.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all other similarly situated persons, pray for the following relief as against Defendants:

A. Certification that, pursuant to Fed. R. Civ. P. 23 (a) and (b) and 29 U.S.C. § 2104(a)(5), Plaintiffs and the other similarly situated former employees constitute a single class;

B. Designation of Plaintiffs as Class Representatives;

C. Appointment of the undersigned attorneys as Class Counsel;

D. A judgment in favor of Plaintiffs and each of the "affected employees" equal to the sum of: their unpaid wages, salary, commissions, bonuses, accrued holiday pay, accrued vacation pay, health and life insurance, and other ERISA benefits, for 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period, all determined in accordance with the WARN Acts, 29 U.S.C. § 2104(a)(1)(4) and NYLL § 860-G(7).

E. Treatment of all damage claims as wage priority status pursuant to 11 U.S.C. § 507(a)(4) or (5) up to the statutory cap of $12,850 per employee, and the remainder as a general unsecured claim, or in the alternative, as a first priority administrative expense pursuant to 11 U.S.C. § 503(b)(l)(A).

F. Plaintiffs' reasonable attorneys' fees and the costs and disbursements that the

Plaintiffs incurred in prosecuting this action, as authorized by the WARN Act, 29 U.S.C. § 2104(a)(6), as well as by California Labor Code § 218.5, Florida Statute § 448.08, Oklahoma Statues, Title 40, § 165.9, and any other applicable state law providing for attorneys' fees;

G. Interest as allowed by law on the amounts owed under the preceding paragraphs; and

H. Such other and further relief as this Court may deem just and proper.

Dated: November 29, 2016

Respectfully submitted,

By: /s/ René S. Roupinian
Jack A. Raisner
René S. Roupinian
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
Email: jar@outtengolden.com
Email: rsr@outtengolden.com

*Attorneys for Plaintiffs and the putative Class*